Nash, J.
I concur with Judge Peaeson in the opinion, that the prisoner is entitled to have his cause reheard before another jury. The presiding Judge erred in instructing the jury, that the assault and battery, committed by the deceased and the witness Brickhouse upon the prisoner and his associate Dick, was an ordinary assault and did" not extenuate the homicide. The time, a late hour in the night, when all appeal to the interference of *407 white men was cut off — the manner, two drunken men, strangers to the prisoner, with their passions inflamed by lust and spirits — all show, that it was not an ordinary assault and battery. It is not simply the force and instrument, that are actually used, which give to an assault its true character, but that character is derived in a great measure from the attending circumstances. Thus, the touching of the person of a female in an indecent manner» is considered as an aggravated offence — so a fillip on the nose. In each of these cases, no force but that of a legal character is used. And yet the perpetrator has so far lost the protection of the law, that, if slain immediately, the homicide is not murder, though a deadly weapon be used. His Honor, therefore, in my opinion,"erred in telling the jury that the assault was an ordinary one. If he meant, that no instrument or weapon of a dangerous character was used by the deceased and the witness Brickhouse, it was a fact that did not, necessarily, enter into the grade of the offence committed by them, and his language was well calculated to mislead the jury — to lead them to the conclusion, that no assault upon a slave by a white man can be an aggravated one, or calculated to produce that furor brevis, which dethrones reason for the time being, and repels the idea of malice in the slayer, except when a deadly or dangerous weapon is used. If such an effect could be produced on the minds of the jury, and cases can be shown, in which the slaying of a white man by a slave will be extenuated from murder to manslaughter, where the assault and battery is an aggravated one, then there must be error in the charge, in point of law, and the prisoner is entitled to the benefit of the ob* jection.
Suppose a parcel of drunken white men, say a dozen, meet a slave in the highway, in a lonely spot, and seize him, and while some hold him, others of the party proceed to beat him, and in his terror and pain, he kills one *408 of them with a deadly weapon, could it be pretended the slayer would be guilty of murder? It is said, the law does not allow a slave to feel the degradation of a blow, when inflicted by a white man, to the point of dethron' ing reason ; does the law equally deny him the privilege of pleading the dethronement of reason from the passion of fear and apprehension ? If this be so, then there was error in the charge. His Honor ought to have instructed the jury, that an assault made by a white man upon a slave, which endangers his life or threatens great bodily harm, will amount to a legal provocation. State v. Jarrott, 1 Ire. Rep. 86. State v. Will, 1 Dev. & Bat. 163, The prisoner was entitled to have the law, bearing upon the case, fully and correctly laid down by the Court. This, in my judgment, has not been done in the matter now discussed ; and as the verdict must have been affected by that error, the prisoner is entitled to a new trial.
But there is another and a graver question to be considered. At the time the prisoner struck the fatal blow, he was in no immediate danger of farther violence by the deceased and the witness Brickhouse. The witness Dick was, at the time of the killing, the sufferer — the blows were then being inflicted on him. If he had committed the homicide while being beaten, in my opinion, his crime would have been manslaughter — is the killing by Caesar entitled to the same consideration ? There is not the slightest evidence of any express malice — will the law, under the circumstances of this case, imply malice ? Most certainly to my mind it will not. I have, in my preceding remarks, treated the case as if the blows, inflicted on Dick, at the time the fatal blow was given, had been inflicted on the prisoner. I have so done, because, if the prisoner were a white man, there is no doubt, at common law, his offence would have been manslaughter, and not murder. Upon this point, the opinion of my brother PeaRson is clear and conclusive. Does the fact, that the prisoner *409 and his associate Dick are slaves, alter the law ? This point has not heretofore been decided by this Court. By the common law, the prisoner’s, offence would clearly be mitigated to manslaughter — by what legislative act, I mean by what act of the legislative power of this country, has that rule been altered as to slaves ? Has this Court power to legislate, to establish “a rule of action,” by which the citizens of the country shall govern themselves ? Is it not a legislative act to dispense with a rule of the common law, which, in mercy to human frailty'-, has been adopted to save life 1 But I am called on, not only to abrogate one rule, but, necessarily, to introduce another. If you say, the prisoner is not entitled to the rule of the common law, which knows no difference of caste, then you not only strip him of a defence, which the common law secured to him, but you establish another rule, that a slave shall, in no case, strike a white man for an assault and battery upon another slave, no matter in what relation he stands to him, or what the force used by the white man, or what the nature of the weapon used by him. I ask for the authority so to declare. I am referred to the degraded state of slaves ; that what would rouse to phrensy a white man, he is brought up from infancy to bow to. I am told, that policy and necessity require that a different rule should exist in the case of a slave. Necessity is the tyrant’s plea, and policy never yet- stript, successfully, the bandage from the eyes of Justice. It does not belong to the bench, but to the halls of legislation. I fully admit, that the degraded state of our slaves requires laws different from those applicable to white men, but I see no authority in the Courts of justice, to make the alteration. The evil is not one, which calls upon the Court to abandon their appropriate duty, that of enforcing the law as they find it. The Legislature, and only the Legislature, can alter the law. It is not likely, however, that they will undertake the task; diffi *410 cult as it is admitted to be, while they find the Courts of justice willing to take from them the responsibility of providing for the evil. There are several cases decided by this Court, upon the subject of homicide, committed by white men on slaves, and by slaves on white men. It is not my purpose, nor would it become me to sit in judgment, on this occasion, upon their correctness — they were made by able men and profound lawyers — by good men, who could not be seduced from what they considered the path of duty; and when a case shall come before me, which is governed by them, I may find it my duty to conform to them. This is a new case, and I feel, not only justified, but commanded to adhere to the common law. It sheds a steady light upon the path of the jurist, and gives him a safe and fixed rule to govern himself by. In all the cases, to which my attention has been drawn, the Judges admit the difficulty of laying down any general rule different from that of the common law. The language oí Chief Justice Taylor in Hale’s case, is, “it is impossible to draw the line (speaking of what will constitute a legal provocation for a battery committed by a white man on a slave) with precision, or lay down the rule in the abstract, but, as was said in Tackett’s case, the circumstances must be judged of by the Court and jury, with a due regard to the habits and feelings of society.” And the late Judge GastoN, than whom an abler Judge or better man never sat upon the seat of Justice, in Jar-rott’s case, after admitting, that no precise rule had been laid down, by which to pronounce what interference of a white man, not the owner, shall be deemed a sufficient legal provocation, and remarking upon the difficulty of so doing, winds up by saying, “that is a legal provocation, of which it can be pronounced, having a due regard to the relative condition of the white man and the slave, and the obligation of the latter to conform his instinct and his passion to his condition of inferiority, that it *411 would provoke well disposed slaves into a violent passion. And the application of the rule must be left, until a more precise rule can be formed, to the intelligence and conscience of the triersThe same profound Judge, in Will's case, furnishes me with a rule for my judgment in this case, of which I gladly avail myself. Will was indicted for the murder of his overseer. His language is, “in the absence then of all 'precedents directly in point, or strictly analogous, the question recurs: if the passions of the slave be excited into unlawful violence, by the inhumanity of his master or temporary owner, or one clothed with the master’s authority, is it a conclusion of law, that such passions must spring from diabolical malice ? Unless I see my way clear as a sunbeam, I cannot believe that this is the law.” Not only do 1 not see my way clear as a sunbeam, but my path, the moment I desert the well known principles of the common law, is obscured by doubts and uncertainties. I look in vain to those, who have preceded me, for a safe guide. The common law tells me, that, although the passion excited in the mind of the prisoner,- by witnessing the cruelty inflicted on his associate and companion, did not justify his killing, yet, springing as it did from the ordinary frailty of human nature, rebuts the idea of malice, and extenuates it to manslaughter. Why should I desert this safe guide, to wander in the mazes of judicial discretion, and that too, in a case of life and death ; and which has been correctly designated by this Court, in a recent case, as the worst and most dangerous of tyranies. The conclusion, to which I have been brought is, that this prisoner is entitled to a new trial for the error in the charge, as to the,nature of the assault and battery committed by the white man. If I were called on to lay down a rule, by which a homicide committed by a slave on a white man in consequence of an assault and battery upon him, should be mitigated to manslaughter, and were at liberty to do so, I should adopt *412 the one stated by Judge Peaeson in this case, as being' safer and more distinct than any one yet suggested. Still in the language of Judge Gaston, in Jarrolt’s case, “the application of the principle must be loft, until a more precise rule can be formed, to the intelligence and conscience of the triers.”
In my opinion, the judgment must be reversed and a venire de novo awarded.
Ruffin, C. J.
I am unable to concur in the judgment of the Court, and, upon a point of such general consequence, I conceive it to be a duty to state my dissent, and the grounds of it.
There are circumstances in the case which might be worthy of consideration, as being unlawful acts on the part of the slaves, prior to the violence on either side. They were from home without passes from their owners, and associated in the street of a village in the middle of the night. They were, thus, subject to be taken up by any one, and might be looked on as the first transgressors. But all observations upon those facts may properly be pretermitted ; because, upon the supposition, that Brick-bourse and Mizell were wrong-doers throughout, it appears to me, that upon adjudged eases and principles, their acts, as far as they had gone, did not amount to a legal provocation; such as ought, or would ordinarily, rouse the angry passion in negro slaves and carry them to such a pitch as to dethrone reason, and, under a sense of outrage and forgetfulness of their vast inferiority, prompt them, through the infirmity of nature, to slay a white man for the trespass.
It is very clear, that the question turns on the difference in the condition of the free white men and negro slaves. For, there is no doubt, ifall the persons had been white men, that the conduct of the deceased would have palliated the killing by the person assaulted, or by his comrade, to manslaughter. It may also be assumed, thats *413 if all the parties had been slaves, the homicide would have been of the same degree. But it has been repeatedly declared by the highest judicial authorities, and it is felt by every person, lay as well as legal, that the rule for determining what is a mitigating provocation cannot, in the nature of things, be the same between persons who are in equali jure, as two freemen, and those who stand in the very great disparity of free whites and black slaves. Thus in Hale's ease, 2 Hawks, 582, the point was, whether a battery by a white man on the slave of another was indictable, and the language of the Court was, “ that, as there was no positive law decisive of the question, a solution of it must be deduced from general principles, from reasonings founded on the common law,, adapted to the existing condition and circumstances of our society, and indicating that result, which is best adapted to general expedience.” Hence the Court held, that such a battery was a breach of the peace and as such indictable : but explicitly declared further, “ that,;, at the same time, it is undeniable, that such offence-must be considered with a view to the actual condition, of society, and the difference between a white man and a slave, securing the first from injury or insult, and the other from needless violence and outrage ; and that from that difference it arises, that many circumstances, which would not constitute a legal provocation for a battery by one white man on another, would justify it, if committed on a slave, provided it were not excessive.” The learned Chief Justice Tavloe would not pretend to frame a precise rule in the abstract, to be applied to every case, but added a reference to his own language in Tackett's case, 1 Hawks 210, ” that the circumstances are to be judged of with a due regard to the habits and feelings of society.” In Tackett's case, although the statute of 1817 enacted, that the killing of a slave should partake of the same degree of guilt, when accompanied with the like *414 circumstances, that homicide then did, it was held by the Court, that the purpose was merely to make the manslaughter of a slave punishable in the same manner with that of a white person ; and that the statute did not mean to declare that homicide, where a slave is killed, could only be extenuated by such a provocation as would have the same effect, where a white person was killed. The Chief Justice says: “the different degrees of homicide, they, (the Legislature.) left to be ascertained by the common Law — a system which adapts itself to the habits, institutions, and actual condition of the citizens, and which is not the result of the wisdom of any one man or society of men, in anjr one age, but of the wisdom and experience of many ages of wise and discreet men. It exists in the nature of things, that, where slavery prevails, the relation between a white man and a slave differs from that, which exists between free persons; and every individual in the community feels and understands, that the homicide of a slave may be extenuated by actst which would not produce a legal provocation, if done by a white person. To define and limit those acts would be impossible; but the sense and feeling of jurors and the grave discretion of Courts cannot be at a loss in estimating their force and applying them to each case, with a due regard to the rights respectively belonging to the slave and white man — to the just claims of humanity, and the supreme law, the safety of the citizens,” The rules thus laid down, though not professing to assume the form of definitions, and to suffice, in themselves, for the determination of every case, are rendered intelligible and material aids upon the point before us by the example, which the Chief Justice adduces to illustrate his meaning.” “It is,” says he, “a rule of law, that neither words of reproach, insulting gestures, nor a trespass on goods or lands, are provocations sufficient to free the party killing front the guilt of murder, where he used a deadly weapon. *415 But it cannot be laid down, that some of those provocations, if offered by a slave, would not extenuate the killing, if it were instantly done, under the heat of passion, and without circumsta'ices of cruelty.” The soundness of the reasoning, on which the Court proceeded in those cases, and of the principles established by it, must be acknowledged, I think, by every candid mind. The dissimilarity in the condition of slaves from any thing known at the common law cannot be denied; and, therefore, as it appears to me, the rules upon this, as upon all other kinds of intercourse between white men and slaves, must vary from those applied by the common law, between persons so essentially differing in their relations, education, rights, principles of action, habits, and motives for resentment. Judges cannot, indeed, be too sensible of the difficulty and delicacy of the task of adjusting the rules of law to new subjects; and therefore they should be and are proportionally cautious against rash expositions, not suited to the actual state of things, and not calculated to promote the security of persons, the stability ofnational institutions, and the common welfare. It was but an instance of the practical wisdom, which is characteristic of the common law and its judicial ministers as a body, that the Courts should, in those cases, have shown themselves so explicit in stating the general principle, on which the rules of law on this subject must ultimately be placed, and yet so guarded in respect to the rules themselves in detail. Yet it is of the utmost importance, nay, of the most pressing necessity, that there should be rules, which, as rules of law, should be known ; so that all persons, of whatever race or condition, may understand their rights and responsibilities in respect to acts, by which blood is shed and life taken, and for which the "slayer may be called' to answer atthe peril of his own life. Whenever, then, the highest judicial tribunal of the country gravely declares its opinion upon a point applicable to a subject thus novel *416 and difficult, great respect is due to it from succeeding Judges. And when a case is brought directly into judgment before such a tribunal, and, in its decision, certain principles are, after full deliberation, solemnly announced and acted on, the judgment ought tobe regarded as set* tling the point decided. If upon any question, it is upon one like this, that a well considered precedent is of utility and binding force. The certainty of the law, in respect to all matters of high importance, requires, especially upon a question of this kind, that the Court should adhere to what is once resolved: more particularly, when the resolution is of some years standing, and the sanction of the legislature may be implied, from the omission of that body, the source of the law, to abrogate or modify it. And when an intelligible principle is explicitly laid down in an adjudication, or necessarily results from it, every consideration of judicial prudence, of the security of the citizen, and of that quiet of mind, which a known law inspires in contradistinction to unknown and uncertain opinions, which successive Judges may individually entertain, should impart to such principle the authority of law. It is under such impressions, that I am led to the opinion, that the prisoner is guilty of murder. It results almost necessarily, as it seems to me, from the doctrine oi Tack-ett's and Hale’s cases, as already quoted. But I consider that,in pursuance of the reasons and rules of those cases, it was expressly decided and the rule laid down in Jar>-rott’s case, 1 Ired. 76, nearly in the very language, in which the instructions were given to the jury in this case. After stating that no precise rule had been before laid down, as to the unlawful interference with the person of a slave by a white man, which should be deemed a legal provocation* extenuating the killing of the assailant to manslaughter, and after acknowledging it to be no easy task to prescribe one for all cases, consistent at once with the policy and the humanity of the law, the Court explicitly *417 declared, that the law “ clearly forbids, that an ordinary assault and battery should be deemed, as it is between white men, a legal provocation,” To my apprehension, that is directly applicable to the case before the Court and decisive of it. The proposition is conceived with clearness and expressed with precision ; and as far as it goes, it affords a safe footing upon firm ground gained in a morass. Why abandon it, not knowing on what we are next to tread 1 It is said, indeed, that the principle laid down is not obligatory, because the adjudication in the case was not in conformity to it, inasmuch as a venire de novo was awarded. Certainly, it was not considered at the time to be an extrajudicial dictum of the Judge, who delivered the opinion ; but the point was deliberately discussed and the conclusion clearly concurred in by every member of the Court. Indeed, whoever will take the pains to examine the case carefully, will find it to be a mistaken supposition, that the point was not in judgment there. The opinion given may be erroneous ; but undoubtedly it was not an unadvised nor an extrajudicial determination. For it will be noticed, that there were four exceptions taken for the prisoner, each one of which it was alike the duty of the Court to consider; and that, in reference to one of them, the position under consideration was relevant, and as such was laid down. The judgment was indeed reversed ; but it was because the Judge refused to instruct the jury, upon the prisoner’s prayer, that, for the insolent language given by the prisoner, the deceased had no right to assault him with a sharp knife and a fence rail, as the deceased repeatedly did. That refusal was the ground of one of the exceptions ; and the Court held, that although insult in words or manner, from a slave to a white person, may excuse or justify a moderate battery, yet it would not authorise one that was excessive or one with the dangerous weapons, which the deceased attempted to use. For such an *418 assault, the party assailed, though a slave, might, upon the instinct of self-preservation, or under the fury which so wanton an attempt upon his limb or life would excite, slay the assailant, without incurring the guilt of murder. But, upon the reversal of the judgment upon-that exception, the prisoner was not discharged, but was sent back to another trial; and hence the Court was called on to dispose of the other exceptions, in order to meet the case as, it ■was seen, it must appear on the next trial. Hence the Court said, that, under a sense of duty they could not forbear examining the case on the other points, nor rightfully decline the declaration of “ the decided judgment they had formed on them.” This question of the provocation of a slave by a white man is not, then, directly presented in the present case for the first time. It was the subject of the three other exceptions in Jarrott’s case in different forms, and it was discussed and the point decided by the Court in reference, expressly, to the effect the judgment was to have on that very man’s life or ■death tin his next trial. It was a decision demanded by the prisoner, and one which directly concerned the public justice to be administered to him, and which the Court was obliged to make. What was said on that occasion was, therefore, as little like an extrajudicial dictum as anything that ever fell from a Court; and, as an authority» it is entitled to as much weight as any adjudication ever made by the Court. What, then, were the decisions on those exceptions ? They were : first, that some matters, which would be sufficient, as provocations, to free a white man from the guilt of murder, would not be sufficient to have the same effect, when the party slain is a white man, and the slayer is a slave : Secondly, that the distinction arose from the. vast difference in the social condition of the whites and the slaves, and was inherent in the castes and not dependent on the character or merits or demerits of different white men : And thirdly, and specifically, that a battery *419 by a white man, which endangers a slave’s life or great bodily harm will amount to a legal provocation ; but that clearly an ordinary assault and battery is not such a provocation. What an ordinary battery is, as meant by the Court, it cannot be difficult to ascertain. The signification would seem naturally to be pointed out, by its being used in immediate and direct contradistinction to a battery, endangering life or causing great bodily harm. The Court cannot be supposed to have an allusion to any act of indignity merely, such as giving a slave a fillip, or pulling his nose, in public ; as that would be an absurd contradiction to the scope of all the reasoning on which the opinion rests, which was declared. An ordinary battery plainly means one, which is described in the books by the term “moderate” -in contrast to that of “excessive,” used likewise in the text books and in the passages quoted from the cases in this Court. There may be other instances, in which, from the severity of chastisement or its cruel protraction, the smart of pain, and the uncertainty of the extent of suffering, to which the unoffending negro may suppose an intention to subject him, may properly be allowed to be a provocation transporting the slave beyond the control of his reason and habitual subordination, and endurance of personal wrongs from the whites. To instances of that kind allusion is made in Jarrott’s case, as being injuries of various grades between the two extremes before mentioned ; and as to them the Court, without undertaking a priori to frame a precise rule, ventures only to advance the general doctrine, that an act is to be deemed a legal provocation, of which it can be pronounced, having due regard to the relative condition of the white man and the slave, and to the obligation of the latter to conform his instinct and his passions to his condition of inferiority, that it would provoke well disposed slaves into a violent passion. Without attempting to enumerate all the instances falling within those observations, or even to give further exam- *420 pies, it is sufficient, that I should say, as his Honor did, that there were here nothing more than ordinary batteries. If they be not of that character, it is difficult to conceive such as would fall within the description. At first some slight slaps with a light board were given, which were evidently in sport, or, if it be liked better, in wantonness, and certainly not to chastise or provoke the slaves — as the witness explicitly stated, that they did not hurt him, and the prisoner told another witness, that he laughed at them. y It is true, that the blows afterwards given with the fist did hurt. But no wounds are described or serious injury mentioned — the witness saying only, that the first blows did not, and that the last did, hurt. The extent of the hurt must, then, be estimated from the conduct the blows produced in the man, on whom they were inflicted ; and by those means it may be correctly estimated. Did they make his blood boil and transport him, so that, being wrought into a tempest of passion, he attempted in retaliation to slay his assailant, or even to join battle with him with their natural weapons ? Far from it. On the contrary, he acted precisely as slaves brdinarily do under such circumstances — in that very manner, indeed, which proves, that the Courts have hitherto rightly judged, that slaves, not dangerously or excessively and cruelly beaten, will not so feel the degradation and outrage of a battery by a white man, as to be prompted instantly to seek redress at the expense of the other’s life. He sought no assistance, but submitted without a struggle, and begged; and, when freed from forcible detention, he made no effort to be revenged, nor showed any resentment, but merely escaped quietly. How, then, can a Court by possibility hold, that such a battery is legally a provocation to kill, when, from the evidence of the man upon whom it was made, we see clearly, that in fact it was not, and produced in him no such impulse ? As it appears to me, then, according to the rule of Jarrott's case, there wks no such *421 battery by either Brickhouse or Mizell, as would have mitigated to manslaughter the killing of either by the person assailed.
If, however, that rule were not to be deemed law in virtue of an adjudication, its intrinsic correctness is sufficient to sustain it. As has been already stated, it is founded on the difference of condition of free white men and slaves, according to our institutions and habits. There is nothing analogous to it in the relations recognised by the common law. TacJcett’s case, and Mann’s case, 2 Dev. 260. It involves a necessity, not only for the discipline on the part of the owner requisite to procure productive labor from them, but for enforcing a subordination to the white race, which alone is compatible with the contentment of the slaves with their destiny, the acknowledged superiority of the whites, and the public quiet and security. The whites forever feel and assert a superiority, and exact an humble submission from the slaves ; and the latter, in all they say and do, not only profess, but plainly exhibit a corresponding deep and abiding sense of legal and personal inferiority Negroes — at least the great mass of them— born with deference to the white man, take the most contumelious language without answering again, and gen- • erally submit tamely to his buffets, though unlawful and unmerited. Such are the habits of the country. It is not now the question, whether these things are naturally right and proper to exist. They do exist actually, legally, and inveterately. Indeed, they are inseparable from the state of slavery; and are only to be deemed wrong upon the admission that slavery is fundamentally wrong. Now, they must necessarily modify the rules of law, regulating the relation of man to man, so as to render them applicable, without injustice, to the two classes and races of our people, and suit them to the exigencies arising out of their living together, with such different passions, prejudices, *422 pursuits, and privileges. How is-that to be effected ? In reference to the point in hand, it would seem that but one method could be devised or thought of; which is that, to which every Judge has resorted, who has been called to make up a judgment on it. It is to ascertain, from careful observation, the actual effect on the bulk of one race of certain conduct on the part of those belonging to the other. Indeed, that is, alone, the ground, on which the law classifies the different kinds of homicide. It is on that principle the law holds, that, when one free person is smitten by another and kills him on the sudden, it is not murder ; because the act is not fairly and generally attributable to malignity of heart, but to that infirmity which is common to men in general in that condition ; and, therefore it is fit, that there should be a compassionate consideration for it. That principle is as applicable to contests arising between the white and slave castes, as to the whites by themselves. The cases of children and apprentices, at the common law, do not rest upon an independent arbitrary rule, but are examples merely of the principle under consideration. It is found that, when fathers and mothers correct those under their tutelage, they are not ordinarily prone to resent by violent retaliation, much less to attempt to kill; but that, on the contrary, the young do the elder reverence. If, then, a child under punishment slays his parent, the conclusion is, that he was not moved to it by heat of blood on the sudden, but by a malignant and diabolical spirit of vengeance. That is the effect of applying that test of common experience between persons in those relations. What will bo the effect of applying it by a calm observer between free whites and negro slaves 1 Why, as laid-down in the cases of Tackett and Mann, in respect to a provocation from a slave to a white man, upon which death takes place, “every individual in the community feels and understands, that the homicide of a slave may be extenúa- *423 ted by acts, which would not constitute a legal provocation, if done by a white person and that “many circumstances, which would not constitute such a provocation for a battery by one white man upon another, would justify it, if committed on a slave.” That, we see, is the result of an application of the principle of the common law to the homicide of a slave by a white man — of that fruit of “the wisdom and experience of many ages of wise.and discreet men, adapted to the habits, institutions, and actual condition of our citizens.” And I think a Judge in this country will find himself compelled to adhere to that rule, whenever he is called to consider, whether the of. fence of a white man, whom lie is trying for killing a slave, is or is not extenuated by the abusive and insolent reproaches of the slave and his trespass on his property before his face. So, it follows, as cértainly as day fol. lows night, that many things, which drive a white man to madness, will not have the like effect, if done by a white man to a slave : and, particularly, it is true, that slaves are not ordinarily moved to kill a white man for a common beating. For, it is an incontestable fact, that the great mass of slaves — nearly all of them — are the least turbulent of all men ; that, when sober, they never attack a white man; and seldom, very seldom, exhibit any temper or sense of provocation at even gross and violent injuries from white men. They sometimes deliberately murder softener at the instigation of others, than on their own motive. They sometimes kill each other in heat of blood, being sensible to the dishonor .in their own caste of crouching in submission to one of themselves. That, however, is much less frequent than among whites ; for they have a duller sensibility to degradation. But hardly such a thing is known, as that a slave turns in retaliation on a white man, and, especially, that he attempts to take life for even a wanton battery, unless it be carried to such extremity as to render resistance proper • in defence- *424 of his own life. Crowds of negroes in public places are often dispersed with blows by white men, and no one remembers a homicide of a white man on such occasions. The inference is, that the generality of slaves — those who are well disposed towards the whites, as are almost all —do not in truth and fact find themselves impelled to a "bloody vengeance, upon the provocation of blows with the fist or a switch from a white man. That is the experience of the whole country. In the course of nearly forty-two years of personal experience in the profession and a very extensive intercourse with other members of the profession from every part of the State, I have not known or heard of half a dozen instances of killing or attempting to kill a white man by a negro in a scuffle, although the batteries on them by whites have been without number, and often without cause or excessive Desperate runaways sometimes resist apprehension by a resort to deadly weapons. But the fact certainly is, negro-slaves can hardly be said to be at all sensible to the provocation of an assault from a white man, as an incentive to spill blood. Such being the real state of things, it is a just conclusion of reason, when a slave kills a whiteman for a battery not likely to kill, maim, or do permanent injury, nor accompanied by unusual cruelty, that the act did not flow from generous and uncontrollable resentment, but from a bad heart — one, intent upon the assertion of an equality, social and personal, with the white,, and bent on mortal mischief in support of the assertion, it is .but the pretence of a provocation, not usually felt. .Therefore, it cannot be tolerated in the law, though acted on in this particular instance by the prisoner — -just as the law will not allow any provocation of words, gestures, or trespass on land or goods from one in equali jure — however grievous sometimes to be borne, and however they may have actually transported a particular individual— to, extenuate a homicide, because,- as it holds, a rational *425 being is not; too infirm to withstand such acts of provocation. Therefore we concluded in Jarrott’s case, as I would now hold, “that the law will not permit the slave-., to resist” — that is, in a case of an ordinary assault and battery on him — “but that it is his duty to submit, or flee, or seek the protection of his master as in almost every instance he would in fact do.
But it was further argued for the prisoner, that Jar-rotfs case is not in conformity with the previous cases of Hale, and of Will, 1 Dev. & Bat. 121, and that for that reason it cannot stand. But I must say, that it seems to me to be consistent with those two and all the other cases on this subject. I aided in the decision of most of them, and thought I understood them, and certainly I was not conscious of any conflict between them; nor am I yet. Hale’s ease decides that a battery on a slave by a stranger is indictable ; and it decides nothing more. It was before my time ; but I acknowledge its authority, and, indeed, heartily concur in it. But it proceeds further, upon a course of reasoning, to lay down a rule modifying that of the common law, as applicable to free equals, by saying — also correctly, as I think — that many things will excuse or justify a battery on a slave, that would not have the same operation in the case of a white person ; and it refers to Tackett’s case as containing, in the passages already quoted from it, the true doctrine of our law, as held' by the Court, on this subject. All that, as far as it goes» is but what was said precisely in Jarrott’s case. Neither Hale's case, nor Tackett’s has a word, as to what redress a slave may take into his own hands for a battery on him by a white man. On the contrary, as was said in Jarrott’& case, it clearly follows e converso from the decision and rule of Tackett’s and the doctrine of Hale’s case, that many things, which, between white persons, are greivous provocations, will not and cannot bo so regarded, when proceeding from a white person to a slave, whose pas *426 sions ought to be and are tamed down to his lowly condition. No one has thought, that there could not be a provocation from a white man to a slave, which would not extenuate a killing of the latter. It was, indeed, at one time held, that there could be no manslaughter of a slave by a white man, and that what would be only an extenuation of the killing of a white man by another, would excuse the killing of a slave by him. That, however, was altered by the Legislature ; and the question, in relation to both kinds of homicide, has since been, what are legal provocations. With respect to the killing of a white man by a slave, we have thought those acts ought not to be recognised as provocations, which, according to common experience, do not, in the actual condition of these people among us, produce in them that furor brevis which the law mercifully regards; and that a moderate chastisement was of that character; but, on the other hand, that, as in Will's case, forcible injuries might be so wantonly and excessively inflicted on a slave, as to palliate his killing his opposer, though a white man. That case strikes me as having as little similitude to the present, as can exist between two cases of homicide in a sudden combat. There, in order to avoid threatened punishment, a negro man ran off from an overseer, who within a few steps brutally shot a whole load of his gun into his back, giving him a most dangerous and painful wound. The slave did not then turn on the assailant, but still endeavored to escape, and the deceased, with a party of slaves pursued and headed him, and, after the prisoner had gone as far as he could, he was overtaken — all within a short period of six or eight minutes — when the overseer seized him for further punishment, and commanded the negroes to lay hold, when the prisoner drew a knife and first struck at one of the negroes and then at the overseer and killed the latter. Upon those facts the Court held, there was a legal pro *427 vocation ; and there certainly was, if human nature has any terror of death, instinct of self-preservation, or any sense, mental or corporeal, of the pain and injury of an unlawful and atrocious attempt to take life. Those were real provocations to any man,- even one.in his condition. But is it to follow therefrom, that a slave, who fora stroke with a switch or a few blows with the fist, kills a white man with a deadly weapon, did so under provocation, which might reasonably and in fact did rouse him to a pitch of furious passion, which drove him to the deed ? Far from it, in my opinion ; and I fear that it is giving occasion unnecessarily to much bloodshed, when it is so held. My conclusion is, that, if the man Dick had killed either of the white men concerned in this unfortunate affair, it would have been murder. And I must express the hope, that it will thus be seen, that my opinion does not proceed upon a cold and rigorous policy of repressing in a slave an actual sense of the wrong done him by a wanton battery, in order more effectually to subjugate him ; but that it rests on the fact, that a com. mon battery from a white man — such as was in this case committed — does not ordinárily provoke a slave to go to the extremity of’taking life.
All the foregoing reasons apply with yet more force against the prisoner ; as he was not engaged in any way, but was a mero looker on. I believe, this is the very first instance in which a slave has ventured to interpose, either between white men, or between a white man and a slave, taking part against the white man. Why should he intermeddle upon the plea of resisting the unlawful power, or redressing the wanton wrong, of a white man, when he, to whom the wrong was done, is admitted to have been unresisting T Shall one slave be the arbiter of the quarrels witnessed by him between another slave and the whites ? It seems to me to bo dangerous to the last degree to hold the doctrine, that negro slaves may *428 assume to themselves the judgment as to the right or propriety of resistance, by one of his own race, to the authority taken over them by the whites, and, upon the notion of a generous sympathy with their oppressed fellow servants, may step forward to secure them from the hands oí a white man, and much less to avenge their wrongs. First denying their general subordination to the whites, it may be apprehended that they wall end in denouncing the injustice of slavery itself, and, upon that pretext, band together to throw off their common bondage entirely. The rule, which extenuates the assistance given by a white manto his friend, in a conflict between him and another white man — all being in equali jure — cannot, I think, be safely or fairly extended, so as to allow a slave, upon supposed generous impulses, to do the noble duty of killing a white man, because he tyrannizes ov er a negro man, so far as to give him a rap with a ratan and a few blows with his fists. I have never heard such a position advanced before, either as- a doctrine of our law or as an opinion of any portion of our people.
For these reasons, the judgment, I think, ought to be affirmed.
Per Curtam. Ordered that the opinion of the majority of the Court be certified to the Superior Court of Law of Martin County, that it may proceed'accordingly.